UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Dwight Martell
and Lynn Cook,

      Plaintiffs,

      v.                     Civil Action No. 2:19–cv–93–jmc

City of St. Albans, Vermont,

      Defendant.

## **OPINION AND ORDER**
(Doc. 18)

Plaintiffs Dwight Martell and Lynn Cook bring this action under 42 U.S.C.

§ 1983, alleging that Defendant the City of St. Albans (City)[1] unlawfully evicted

them without due process or just compensation in violation of the Fourteenth

Amendment Due Process Clause, the Fourth Amendment proscription against

unreasonable seizures, and the Fifth Amendment Takings Clause.[2]  (Doc. 4.)

---

[1] Plaintiffs originally also named as Defendants Dominic Cloud, in his official capacity as City Manager; Matt Mulheron, in his official capacity as Deputy Fire Chief and Deputy Health Officer; and Charles Sargent, in his official capacity as Fire Marshal and Health Officer.  (*See* Doc. 4.)  On October 1, 2019, however, the Court granted the parties' "Stipulated Motion to Dismiss Individual Defendants in Their Official Capacity and Amend Case Caption," dismissing all claims brought against these individual Defendants in their official capacities and amending the case caption to include only the City of St. Albans as Defendant in this case.  (*See* Docs. 22, 23.)

[2] Plaintiffs also originally alleged a Vermont state-law claim of forcible entry or detainer, in violation of 12 V.S.A. § 4911.  (*See* Doc. 4.)  However, on January 24, 2020, Plaintiffs voluntarily dismissed the claim.  (Doc. 37.)

Presently before the Court is the City's Motion to Dismiss Plaintiffs' Complaint.[3] (Doc. 18.) Oral argument on the Motion was held on January 28, 2020.

For the reasons stated below, Defendant's Motion to Dismiss (Doc. 18) is GRANTED in part and DENIED in part.

## Background

On June 11, 2019, Plaintiffs filed their Complaint, asserting that, on August 29, 2019, the City unlawfully evicted them from their homes in the building located at 21-23 Lincoln Avenue in St. Albans, Vermont. (Doc. 4 at 12, ¶ 51.) Plaintiffs allege they were both tenants renting their respective units from the owner of the building, Richard Marchessault. (*Id.* ¶ 56.) Approximately two weeks before they were ordered to vacate, Matt Mulheron, the City's Deputy Fire Chief, advised Plaintiff Martell that there would be an inspection of the building and it "would likely be condemned." (*Id.* ¶ 57.) No City official ever informed Plaintiff Cook of the upcoming inspection. (*Id.* ¶ 58.)

Plaintiffs further allege that, on August 28, 2018, Mulheron conducted an inspection of the building, including Plaintiffs' units, pursuant to the City's Public Health & Safety Ordinance (PHSO). (*Id.* at 13, ¶ 60.) On the next day, August 29, Mulheron and Charles Sargent, the City's Fire Chief, returned to the property accompanied by three police vehicles, and immediately disconnected the water, gas, and power in the building. (*Id.* ¶ 61.) Sargent and Mulheron informed Plaintiffs

---

[3] The individual Defendants (who are no longer part of the case, as explained in Footnote 1) also filed respective Motions to Dismiss Plaintiffs' Complaint (*see* Docs. 19, 20), but they have since been denied as moot in the Court's Order granting the parties' "Stipulated Motion to Dismiss Individual Defendants in Their Official Capacity and Amend Case Caption" (Doc. 23).

that they could not stay the night there, rendering Plaintiffs homeless as a result of the property's "condemnation." (*Id*. ¶¶ 61–62.)

On the date they were ordered to vacate the property (August 29, 2018[4]), Plaintiffs were "handed" a Safety Order that was addressed to Marchessault, as the property owner, and signed by Mulheron. (*Id*. ¶ 63; *see* Doc. 4-2.) The Order declares the property "unsafe for human occupancy or use," and lists over 30 conditions and PHSO violations that the City considered "unsafe and dangerous" on the property. (Doc. 4-2 at 1.) The Order states that these conditions and violations "must be abated by . . . October 5, 2018," which was approximately 37 days from the date of the Order. (*Id*.) The Order further states: "After conversations with property owner Richard Marchessault[,] he stated there is no intent to rectify any of the aforementioned violations. With all information provided[,] we declare this property unsafe for occupancy or use." (*Id*. at 3.) The Order closes by informing Marchessault of his right to appeal and providing instructions on how to do so. (*Id*. at 4.) The City never issued any civil penalties or took legal action against Marchessault for his failure to comply with the terms of this Order. (Doc. 4 at 19, ¶ 103.)

Plaintiffs allege that, on September 10, 2015, approximately three years prior to issuance of the August 28, 2018 Safety Order, the City had inspected the subject property and notified the owner of several violations. (*Id*. at 17–18, ¶ 90.) Pursuant

---

[4] The Complaint states that the condemnation occurred on "August 29, *2019*" (*id*. at 13, ¶ 61 (emphasis added); *see id*. at 21, ¶ 110); but this appears to be a typographical error as other parts of the Complaint and the parties' briefs indicate that the condemnation occurred one day after Mulheron inspected the building, *i.e.*, on August 29, *2018* (*see e.g., id*. at 19, ¶ 100 (referencing "the condemnation [occurring] on August 29, *2018*") (emphasis added)).

to that inspection, the City issued an inspection report ordering that the violations be remedied within 30 days and scheduling a re-inspection on November 26, 2015. (*Id.* at 18, ¶¶ 91–92.) The City never conducted that re-inspection and failed to take action to enforce the September 2015 inspection report. (*Id.* ¶¶ 93–95.)

Plaintiffs further allege that, on April 3, 2018, approximately four months prior to issuance of the August 28, 2018 Safety Order, the City issued a Notice of Ordinance Violation regarding trash and inoperable vehicles in the yard of the subject property (*id.* ¶ 96), and thereafter issued monthly fines to Marchessault for the trash violations (*id.* at 19, ¶ 99).

Plaintiffs claim that, after they were ordered to vacate the property, they were housed in motel rooms for months, under Vermont's "emergency assistance program." (*Id.* at 15, ¶ 76; *see generally id.* at 15–17, ¶¶ 74–86.) In the process of moving, they lost numerous belongings including a "beloved pet," incurred significant cost-of-living expenses, and suffered emotional pain as a result of the eviction. (*Id.* at 16, ¶ 84; *see generally id.* at 16–17, ¶¶ 81–89.) Plaintiffs seek declaratory and injunctive relief, as well as compensatory damages. (*Id.* at 24–25.)

## Analysis

### I.     Rule 12(b)(6) Standard

In evaluating whether to dismiss a complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6), the court tests the pleading for "facial plausibility." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This does not require a plaintiff to provide "detailed factual allegations" to support his claims, *Twombly*, 550 U.S. at 555, but plaintiffs must allege facts that permit "more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678. Accordingly, allegations that "are so vague as to fail to give the defendants adequate notice of the claims against them," are subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009); *see also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

On a Rule 12(b)(6) motion to dismiss, "the [c]ourt is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference," as well as "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." *Heckman v. Town of Hempstead*, 568 F. App'x 41, 43 (2d Cir. 2014). Moreover, the court is not obliged to "accept allegations that are 'contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint.'" *Adeniji v. N.Y. State Office of State Comptroller*, No. 18 Civ. 0761 (PAE) (BCM), 2019 WL 4171033, at *3 (S.D.N.Y. Sept. 3, 2019) (slip op.) (quoting *Fisk v. Letterman*, 401 F. Supp. 2d 362, 368 (S.D.N.Y. 2005)).

In assessing the adequacy of the pleadings, a court must accept all factual assertions as true and draw all reasonable inferences in favor of the plaintiff. *Lanier v. Bats Exch., Inc.*, 838 F.3d 139, 150 (2d Cir. 2016). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Iqbal*, 556 U.S. at 678; *see Twombly*, 550 U.S. at 555, 557 (holding that a pleading containing "a formulaic recitation of the elements of a cause of action," "labels and conclusions," or "naked assertion[s]" devoid of factual enhancement, does not satisfy Federal Rule of Civil Procedure 8(a)). A complaint is properly dismissed where, as a matter of law, "the allegations in [it], however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## II.   42 U.S.C. § 1983

Under 42 U.S.C. § 1983, a plaintiff may bring suit "against '[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . .'" *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (alteration and omissions in original) (quoting 42 U.S.C. § 1983). "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Id.* Section 1983 does not itself create or establish a federally protected right; instead, it provides a cause of action to enforce federal rights created elsewhere, such as a federal constitutional right. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). The U.S. Supreme Court has identified two elements of a § 1983 claim: "a plaintiff [(1)] must allege the violation of a right secured by the Constitution and laws of the United States, and [(2)] must show that the alleged

deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). Here, the City does not dispute that the conduct complained of occurred "under color of state law."[5] Thus, the relevant question is whether Plaintiffs have sufficiently stated a plausible claim that they were deprived of their federally secured rights.

"[A] municipality can be held liable under Section 1983 if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)). "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory," *Monell*, 436 U.S. at 691; rather, liability will attach only where the action of the municipality itself can be said to have caused the harm. *See Nagle v. Marron*, 663 F.3d 100, 116 (2d Cir. 2011). Thus, a municipality may be held liable when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690. In addition, "when a municipality 'chooses a course of action tailored to a particular situation,' this may also 'represent[ ] an act of official government "policy" as that term is commonly understood.'" *Montero v. City of Yonkers*, 890 F.3d 386, 403 (2d Cir. 2018) (alteration in original) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 125 (2d Cir. 2004)). To attach such liability to a municipality, a plaintiff must show

---

[5] The City also makes several other concessions solely for purposes of resolving the instant Motion to Dismiss. (*See* Doc. 18-1 at 4 n.7, 5 n.8, 6 n.9, 7 n.12; Doc. 29 at 2 n.1.)

a "direct causal link" between the official policy and the alleged constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

## III. Plaintiffs' Constitutional Claims

Plaintiffs allege that their Fourteenth Amendment right to procedural due process and Fourth Amendment right to be free from unlawful seizure were violated by the City's act of condemning and prohibiting them from occupying their homes without providing Plaintiffs with "notice of any hazard that existed at the premises that created an imminent . . . threat to [their] health or safety" (Doc. 4 at 20–21, ¶ 108), and without making available to Plaintiffs "any pre- or post-deprivation procedure to review the determination of [the City] to remove them from their homes" (*id.* at 21, ¶ 110). Plaintiffs further claim that the City lacked "constitutionally sufficient statutory authority" to seize their homes. (*Id.*)[6]

Plaintiffs also allege that the City abridged their Fifth Amendment rights, by knowingly allowing violations of City ordinances to occur on the subject property, and by failing to take adequate action to enforce these ordinances before the violations became serious enough to require Plaintiffs' removal from the property. (*Id.* at 23–24, ¶¶ 109–16.)

### A. Fourteenth Amendment Procedural Due Process Claim

Plaintiffs allege that the City's forcible removal of them from their leased property violated the Fourteenth Amendment. (*Id.* at 20–21.) More specifically,

---

[6] Plaintiffs' Complaint is mis-numbered; two consecutive paragraphs are numbered "110." (*See id.*; *see also id.* at 19–20 (repeating paragraph numbers 102 and 103); *id.* at 20–24 (repeating paragraph numbers 108–16).)

Plaintiffs claim that the City's PHSO, the City's emergency eviction policies and practices, and the City's actions in this particular case deprived Plaintiffs of a protected property interest in their tenancies without due process of law. (*Id.*) Plaintiffs' argument is twofold: first, no "imminent actual or potential threat to Plaintiff[s'] health or safety" existed on the condemned property to justify the failure to offer Plaintiffs a "pre-deprivation opportunity" to challenge the decision condemning the property (*id.* at 21, ¶¶ 108, 109); and second, even if such an emergency existed, the City "failed to apprise Plaintiffs of the availability of any pre- or post-deprivation procedure" to review the City's decision to remove Plaintiffs from their homes (*id.* at ¶ 110). The City concedes that Plaintiffs have a protected property interest in their tenancy but argues that the PHSO satisfies procedural due process requirements and that Plaintiffs were provided sufficient notice and opportunity for hearing.

It is well settled that due process generally requires notice and a hearing prior to an eviction. *See Fuentes v. Shevin*, 407 U.S. 67, 81–82 (1972); *Breon v. Perales*, No. 6:15-cv-6335(MAT), 2015 WL 7289399, at *3 (W.D.N.Y. Nov. 16, 2015) (collecting cases). However, a pre-deprivation hearing is not required when an emergency situation exists, which renders meaningful pre-deprivation process impractical, and when adequate post-deprivation remedies are available. *WWBITV, Inc. v. Vill. of Rouses Point*, 589 F.3d 46, 50 (2d Cir. 2009) (citing *Parratt v. Taylor*, 451 U.S. 527, 539 (1981)); *see Fuentes*, 407 U.S. at 90 ("There are extraordinary situations that justify postponing notice and opportunity for a hearing[;] [t]hese situations, however, must be truly unusual." (internal quotation marks and citation

omitted)).  Moreover, "where the need to protect lives is the basis for [an emergency eviction], government officials should not be made to hesitate in performing their duties, particularly where post[-]deprivation remedies can immediately correct any errors in judgment." *Flatford v. City of Monroe*, 17 F.3d 162, 168 (6th Cir. 1994). For an eviction claim like the one at issue here to survive a motion to dismiss, at the pleading stage, the plaintiff:

> must provide factual allegations that permit a plausible inference that (1) the relevant official(s) *lacked "competent evidence . . . to reasonably believe" that an emergency existed*; or (2) that an official's decision to invoke an emergency procedure was "arbitrary or amount[ed] to an abuse of discretion"; or (3) that a state's post-deprivation remedies are somehow inadequate.

*Heckman*, 568 F. App'x at 45 (alterations in original) (emphasis added) (quoting *Catanzaro v. Weiden*, 188 F.3d 56, 63 (2d Cir. 1999)).

Drawing all reasonable inferences in Plaintiffs' favor, as required on a Rule 12(b)(6) motion to dismiss, the Court finds that Plaintiffs have plausibly alleged that the City did not "reasonably believe" that, at the time of Plaintiffs' eviction, an emergency existed that made pre-deprivation process impractical.  *See Vision for Children, Inc. v. City of Kingston*, No. 1:15-CV-0164 (BKS/DJS), 2017 WL 9249665, at *16, 18 (N.D.N.Y. June 7, 2017) (declining to grant city's motion for summary judgment on plaintiff's procedural due process claim, where there was "conflicting evidence as to the severity and urgency of the [deterioration of the relevant building] and the motivation of the decision-makers," and where "it [wa]s unclear whether there was competent evidence underlying the decision to allow [the deputy fire chief] to reasonably believe an emergency existed"); *Cinema Art Theater, Inc. v.*

*City of Troy*, 810 F. Supp. 2d 489, 497 (N.D.N.Y. 2011) (declining to grant city's motion for summary judgment on plaintiff adult movie theater's procedural due process claim, where court could not conclude as a matter of law that condition of theater marquee created a "genuine emergency," as conflicting evidence "arguably call[ed] into question the competency of the evidence underlying the [city's] decision to remove the marquee and the reasonableness of the decision based on that evidence"); *but see Alger v. Dept' of Labor and Industry*, 2006 VT 115, ¶ 29, 181 Vt. 309, 917 A.2d 508 (granting Department's motion to dismiss plaintiff's procedural due process claim, where "complaint concede[d] the existence, and . . . the seriousness, of [dangerous code] violations" indicating "an immediate risk of serious bodily harm," but noting that "there might be circumstances under which the Department's findings of code violations would be insufficient to establish the exigency necessary for action without a prior hearing").

Plaintiffs allege that the August 28, 2018 Safety Order itself demonstrates there was no emergency requiring immediate condemnation of their homes. (Doc. 28 at 8.) Specifically, the Order gave Marchessault, as the property owner, 37 days (until October 5, 2018) to abate the identified violations. (Doc. 4 at 13–14, ¶ 65.) Therefore, Plaintiffs argue, "the City found that the premises were safe enough to allow tenants to reside there for 37 days while the property owner made repairs"; and, "if [the property] was safe enough for Plaintiffs to live in the building for 37 days pending repairs, it was safe enough to allow tenants to live there for 37 days pending enforcement action or appeal." (Doc. 28 at 9.) In those 37 days, argue Plaintiffs, the City could have provided a pre-deprivation notice to Plaintiffs

and an opportunity for them to contest the condemnation. (*Id.*) Instead, the City ordered the immediate condemnation of the property, apparently based on Marchessault's statement, as recited in the Safety Order, that "there is no intent to rectify any of the [subject] violations." (Doc. 4-2 at 3.) Considering these facts in the light most favorable to Plaintiffs, they raise a plausible inference that the City did not reasonably believe that an emergency necessitating Plaintiffs' immediate eviction existed on August 29, 2018, when Plaintiffs were ordered to vacate the property. Although the City will of course have an opportunity at later stages in the case to proffer evidence demonstrating the existence of imminently dangerous emergency conditions that it believed justified its decision to order Plaintiffs to immediately vacate the property, at this early stage in the case, Plaintiffs have alleged sufficient facts to state a plausible claim for relief. *See Heckman*, 568 F. App'x at 46.[7]

Plaintiffs also argue that, even if an emergency existed justifying their immediate eviction from their leased property, adequate notice of the condemnation of that property was not provided to them because: (1) the August 28, 2018 Safety Order that declared the property unsafe for human occupancy or use was addressed to neither Martell nor Cook, and did not apprise them of their post-deprivation remedies; and (2) the City provided no other type of written notice to Plaintiffs

---

[7] It is of no moment that the City may have been acting pursuant to the PHSO under authority delegated to it by the State of Vermont. *See Breon*, 2015 WL 7289399, at *3 ("[T]he fact that the Code Enforcement Officer purported to act pursuant to various sections of the State Property Maintenance Code does not mean that his actions are shielded from constitutional scrutiny."); *cf. Pollnow v. Glennon*, 757 F.2d 496, 501 (2d Cir. 1985) ("[I]t is unnecessary for [the court] to determine whether appellees violated any applicable state law[, as] [c]learly, a violation of state law is not cognizable under § 1983.").

regarding a right to appeal the condemnation either before or after it occurred. (Doc. 28 at 12–14; *see* Doc. 4 at 13, ¶ 63; 14–15, ¶¶ 68–72.)  The City responds by pointing out that the Safety Order "include[s] an explicit reference to the availability of the post-deprivation appeals process and the manner in which such an appeal may be pursued, albeit in terms of the 'property owner'" rather than Plaintiffs.  (Doc. 18-1 at 11.)  Moreover, the City states that the PHSO informs tenants like Plaintiffs, as "person[s] aggrieved by a safety order," of their right to appeal the condemnation to the City Council.  (*Id.*; *see* Doc. 4-1 at 21, § 8A.)  Taking the PHSO and the Safety Order together, the City contends Plaintiffs were provided adequate notice of their post-deprivation remedies.  (Doc. 18-1 at 12.)

When asked to evaluate the adequacy of notice, several courts have declined to adopt the test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), in favor of a "more straightforward test of reasonableness under the circumstances," as articulated in *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950). *Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *see, e.g.*, *Gardner v. Evans*, 920 F.3d 1038, 1060 (6th Cir. 2019); *Grayden v. Rhodes*, 345 F.3d 1225, 1242 (11th Cir. 2003).  Under *Mullane*, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane*, 339 U.S. at 314. The notice may not be a "mere gesture," but must "in itself [be] reasonably certain to inform those affected."  *Id.* at 315 ("The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.").  In some circumstances, the existence of a publicly available statute may be

sufficient to provide the required notice. *See, e.g.*, *City of W. Covina v. Perkins*, 525 U.S. 234, 241 (1999) (holding that, once the owner of personal property has been informed that his property has been seized, "he can turn to . . . public sources[, including published, generally available state statutes and case law,] to learn about the remedial procedures available to him," and "[t]he City need not take other steps to inform him of his options"). But in other cases, including cases like this where the deprivation is as significant as eviction from one's home, the mere existence of a publicly available statute is inadequate. *See Gardner*, 920 F.3d at 1061 ("It is not a foregone conclusion that the mere posting of information on a city's website is a 'reasonably calculated' way, under all the circumstances, to apprise persons evicted from their homes that they may appeal the [eviction].").

For example, in *Grayden v. Rhodes*, where the subject eviction notice provided no information about the right to a hearing, the Eleventh Circuit found that a city ordinance, standing alone, was not enough to satisfy due process. 345 F.3d at 1243. The court explained: "The law does not entertain the legal fiction that every individual has achieved a state of legal omniscience; in other words, there is no presumption that all of the citizens actually know all of the law all of the time." *Id.* And in *Gardner v. Evans*, the Sixth Circuit considered the adequacy of notice where, in addition to the existence of publicly available documents about the appeals process, "red tags" were given to evicted tenants, which (1) advised tenants how they should proceed with scheduling a re-inspection once the required repairs were completed, and (2) provided tenants with the contact information of the inspector in the event they had "any questions or concerns about complying within

14

the time indicated." 920 F.3d at 1059. The court held that these "red-tag notices" were insufficient because the information provided therein was merely "about remedying violations," and "the contact information provided by the red tag would give [tenants] no indication of [their] opportunity to appeal." *Id.* at 1062. The court explained:

> *The information [provided in the red tags] is exclusively oriented toward realizing repairs to the home, not contesting the . . . decision [that the home is unfit for human occupation] in the first place. . . .* An evicted tenant would have no reason to think calling the inspector would do her any good should she seek to appeal the [eviction] decision . . . . And even if she did call the number, the record reveals that the inspector might be of little help. Inspector Scott Sanford—whose name appeared on the notice attached to [the plaintiff's] home—testified, "I don't know what the legal rights of a tenant would be as far as, you know, appealing something that he doesn't own to the City. So you would have to talk to the city attorney's office about that."

*Id.* (emphasis added). Given these facts, the court in *Gardner* found that the City of Lansing, Michigan's "mere reliance on its website and the limited language of [its] red[-]tag notices was not reasonably calculated to notify evicted tenants of their right to appeal and their 20-day window to do so." *Id.*

Similarly, here, the Safety Order is "oriented toward realizing repairs to the [property], not contesting the . . . decision [to condemn it]." *Id.* (*See* Doc. 4-2.) Moreover, the Order was not given to Plaintiffs until the day they were ordered to vacate the subject property, *i.e.*, Plaintiffs were given no advance warning and no time to appeal before losing their leasehold interest in the subject property. (*See* Doc. 4 at 13, ¶ 61.) Furthermore, although the Order includes information about how to appeal and provides the contact information for the person responsible for receiving appeals, this information is explicitly addressed to Marchessault, as the

property owner, rather than to Plaintiffs, as the tenants, stating: "*As the property owner*, you have the right to appeal this Safety Order." (Doc. 4-2 at 4 (emphasis added).) Nothing in the Order informed Plaintiffs (or other tenants) that *they* had a right to appeal.

In *Brody v. Village of Port Chester*, 434 F.3d 121, 129 (2d Cir. 2005), the Second Circuit considered the condemnation of property planned for a redevelopment project in New York State, and held that Fourteenth Amendment due process required that the condemning municipality provide *to all potential condemnees* individual notice by mail of the procedure for challenging the subject condemnation, where the municipality had the names and addresses of the potential condemnees and they were not so numerous as to make individual notice impracticable. Moreover, the court explained that, in order for the content of the notice to be "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action,'" it "must make some conspicuous mention of the commencement of the [30]-day review period to satisfy due process." *Id.* at 130 (quoting *Mullane*, 339 U.S. at 314); *see also Davis v. Weir*, 328 F. Supp. 317, 321–22 (N.D. Ga. 1971) (holding that "[t]he City cannot terminate water service without [providing] notice *to the actual user of the service*—in this case, the plaintiff"—as opposed to the landlord responsible for paying the water bill (emphasis added)).

The City relies on *Brown v. City of Barre, Vt.*, 878 F. Supp. 2d 469, 493 (D. Vt. 2012), for the proposition that "the fact that . . . notice [to tenants prior to termination of their water service] is addressed to the 'customer' [(or landlord)]

16

rather than [to] the tenants does not deprive the[] [tenants] of notice." [8]  (*See* Doc.

18-1 at 10; Doc. 29 at 3–4.)  Analogizing to this case, the City argues that the Safety

Order does not violate due process merely because it is addressed to the property

owner (Marchessault) rather than to the tenants (Plaintiffs).  (*Id.*)  But the sentence

in *Brown* that the City relies on was written in reference to a state statute that

required "a detailed and comprehensive written notice to be provided to a water

user as a condition precedent to [water] termination," within "at least two weeks[]"

of the termination.  *Brown*, 878 F. Supp. 2d at 493.  The court found that, having

provided tenants with at least two weeks' notice and a panoply of information about

the water termination, the mere fact that the notice was "addressed to the

'customer' [(*i.e.*, landlord)] rather than the tenant" was not enough to overcome the

---

[8]  In *Brown*, the court recognized that the "private interest in continued water service" is "substantial in light of water's status as a necessity of daily living that is essential to health, well-being, safety, and sanitation."  *Id.* at 492; *see Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 18, 20 (1978) (noting that "[u]tility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety," and that, "[a]lthough utility service may be restored ultimately, the cessation of essential services for any appreciable time works a uniquely final deprivation").  *Brown* and other cases finding the continuation of water or other essential utility services to be a protected property interest, arguably are applicable to eviction cases like this because the deprivation of these services has been found to be akin to a constructive eviction.  *See, e.g.*, *Winston v. City of Syracuse*, 887 F.3d 553, 566 n.12 (2d Cir. 2018) ("Other circuits have found that a tenant has a property interest under landlord-tenant law to bring an action to enjoin her landlord from constructively evicting her by terminating water service or declining to pay for it." (internal quotation marks omitted)); *DiMassimo v. City of Clearwater*, 805 F.2d 1536, 1539–40 (11th Cir. 1986) (finding a protectible property interest in the continuation of water service because "it is clear that [state law] would not sanction the withdrawal of water services from . . . tenants by their landlords because such action would constitute either the failure to provide necessary facilities for sustaining life or the constructive eviction of tenants"); *but see Burgess v. City of Houston*, 718 F.2d 151, 154 (5th Cir. 1983) ("[Although] there is a constitutionally protected right to continued utility service[,] [n]o authority has been discovered . . . for the proposition that there is a constitutional right to receive electric power when the applicant refuses to comply with reasonable administrative procedures." (citation omitted)); *James v. City of St. Petersburg, Fla.*, 33 F.3d 1304, 1307 (11th Cir. 1994) ("The property interest said to have entitled the tenants to due process [in *DiMassimo*] was not the expectation of continued water service as mere users, but the 'right to prevent the landlord from obtaining a constructive eviction by disconnecting the city water services.'" (quoting *DiMassimo*, 805 F.2d at 1540)).

conclusion that the state statute "provides procedural due process to sufficient[ly] protect a water user's interest in continued water service even when that water user is not [the person who pays for the service]." *Id*. at 493, 494.

It is important to note, however, that the court in *Brown* ultimately held that the relevant City of Barre ordinance and form notice—which did not "address [the tenant's] appellate rights[,]" and which "effectively guarantee[d] the tenant not more than one day [before termination of water service] to contact the authorities"—did *not* afford tenants procedural due process. *Id*. at 496. The court held:

> [T]he City provides neither reasonable notice nor a reasonable opportunity to defend to the tenants who are the actual users of municipal water service. Plaintiffs' private interest in water service is substantial and the risk of an erroneous deprivation of that interest is great. Procedural due process requires at least sufficient notice to ensure that access to available forums is not effectively foreclosed and a potential means of redress is not lost. Here, those avenues of relief are not reasonably available. Accordingly, the form of notice, the manner of notice, and the time period for notice are constitutionally deficient.

*Id*. at 496 (emphasis added) (citation omitted). Similarly, here, Plaintiffs have plausibly alleged that the City's notice (the Safety Order)—which also does not address Plaintiffs' appellate rights, and which was given to Plaintiffs at the exact moment when Plaintiffs were required to vacate the property—is constitutionally deficient.

At this early stage in the case, and accepting the Complaint's factual allegations as true, the Court finds that Plaintiffs have plausibly alleged that the Safety Order was not "reasonably calculated, under all the circumstances," to apprise them of their right to appeal, *Mullane*, 339 U.S. at 314, especially

considering that: (1) the Order required Plaintiffs to vacate their leased property immediately; and (2) on its face, the Order is mostly concerned with the abatement of violations rather than the decision to condemn and is explicitly directed to the property owner rather than to Plaintiffs or other tenants.

**B.     Fourth Amendment Unlawful Seizure Claim**

Plaintiffs allege that the City violated their Fourth Amendment rights "by seizing their homes without constitutionally sufficient authority for doing so."  (Doc. 4 at 21, ¶ 110.)  More specifically, Plaintiffs contend that the City's act of "summarily evict[ing]" them from their "family homes" constituted an "unreasonable seizure in violation of the Fourth Amendment."  (Doc. 28 at 4.)

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures" by government actors.  U.S. Const. amend. IV; *see Camara v. Mun. Court of City and Cty. of San Francisco*, 387 U.S. 523, 528 (1967).  A "seizure" of property under the Fourth Amendment "occurs when 'there is some meaningful interference with an individual's possessory interest in that property.'"  *Soldal v. Cook Cty.*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  In addition, in order to be actionable, the seizure must be "objectively unreasonable."  *Slavas v. Town of Monroe*, Case No. 16-cv-30034-KAR, 2017 WL 959575, at *15 (D. Mass. Mar. 10, 2017) (quoting *Thomas v. Cohen*, 304 F.3d 563, 574 (6th Cir. 2002)). Indeed, while there is an "exigency exception" under the Fourth Amendment, *Flatford*, 17 F.3d at 170, "reasonableness is still the ultimate standard," *Soldal*, 506 U.S. at 71 (quoting *Camara*, 387 U.S. at 539).

Plaintiffs' Fourth Amendment unlawful seizure claim parallels their Fourteenth Amendment due process claim.[9] As discussed above, pursuant to the latter claim, Plaintiffs allege, in part, that no imminent threat to Plaintiffs' health or safety existed on the condemned property, and therefore the City should have offered Plaintiffs a pre-deprivation opportunity to challenge the decision condemning the property. In emergency eviction cases like this, "the Fourth Amendment standard of reasonableness requires no more of government officials than that of [the Fourteenth Amendment's] due process of law [requirement,]" and, as noted above, "[b]oth constitutional provisions recognize an exigency exception." *Flatford*, 17 F.3d at 170. Accordingly, there is "no practical distinction" between Plaintiffs' Fourth and Fourteenth Amendment claims, *id.*, and the Fourth Amendment claim survives the City's Motion to Dismiss insofar as Plaintiffs have plausibly alleged that the City did not reasonably believe an emergency existed justifying the need for an immediate eviction,[10] as explained above in the context of Plaintiffs' Fourteenth Amendment claim. *See Soldal*, 506 U.S. at 70 ("Certain

---

[9] Of note, the Fourth Amendment claim is included in the same section of the Complaint as the Fourteenth Amendment claim. (*See* Doc. 4 at 20–21.)

[10] Plaintiffs also argue that the City violated their Fourth Amendment rights because the State of Vermont did not sufficiently delegate to the City the power to remove tenants from their homes as a means to abate public nuisances, absent conditions that pose an immediate danger to health or safety, and the City was therefore without authority to order them to vacate. (Doc. 28 at 4–7.) *See* 24 V.S.A. § 5003(c)(11)(A) (granting municipalities power to enact housing ordinance with provisions that permit the enforcing officer to "[o]rder the dwelling or dwelling premises to be vacated" whenever the officer finds the dwelling to be "unfit for human habitation because of defects which constitute a serious hazard or immediate peril to the health, safety[,] or welfare of the occupants of the dwelling or the public"). This formulation of Plaintiffs' Fourth Amendment claim similarly rests on the factual question of whether the City reasonably believed that conditions existed on the property that posed an imminent risk to health or safety. Accordingly, because Plaintiffs have plausibly alleged that the City did not reasonably believe an emergency existed, their Fourth Amendment claim survives the City's Motion to Dismiss.

wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands.").

### C.    Fifth Amendment Takings Clause Claim

Plaintiffs also advance a claim against the City under the Fifth Amendment Takings Clause. (*See* Doc. 4 at 23–24, ¶¶ 108–16.) Specifically, Plaintiffs allege that the City was aware of the various violations of its PHSO and Minimum Housing Standards Ordinance (MHSO) (jointly referred to herein as "the housing codes") on the subject property, but failed to enforce these ordinances against Plaintiffs' landlord, thereby allowing the violations to continue unabated until they became so serious that the City allegedly was required to evict Plaintiffs without prior notice. Thus, Plaintiffs contend that the City's eviction of them from their homes constituted a "taking within the meaning of the Vermont and United States Constitutions," for which they are entitled to "just compensation." (*Id.* at 24, ¶¶ 115, 116.)[11] In response, the City argues that its alleged failure to enforce the housing codes against Marchessault is insufficient to state a takings claim. (Doc. 18-1 at 18–20.)

Both the federal and Vermont Constitutions prohibit the government from taking private property for public use "without just compensation." U.S. Const.

---

[11] In their Opposition to the City's Motion to Dismiss, Plaintiffs argue that because the City was not abating a public nuisance when it ordered Plaintiffs to vacate their homes, its actions are not protected by the so-called "nuisance exception" to the rule that individuals are entitled to just compensation when their property is taken by the government. (*See* Doc. 28 at 16–18.) However, because Plaintiffs did not plead this claim in their Complaint, the Court does not consider it here. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998); *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 518, 526 (S.D.N.Y. 1977) ("a party is not entitled to amend his pleading through statements in his brief").

amend. V ("[N]or shall private property be taken for public use, without just compensation."); Vt. Const. ch. I, art. 2 ("[P]rivate property ought to be subservient to public uses when necessity requires it, nevertheless, whenever any person's property is taken for the use of the public, the owner ought to receive an equivalent in money."). This restriction applies not only when the government formally takes property via eminent domain, but also when government regulation "denies all economically beneficial or productive use of land." *Lucas v. S. Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992). Leasehold interests, in addition to ownership interests, are protected property interests under the Takings Clause. *See Alamo Land & Cattle Co., Inc. v. Arizona*, 424 U.S. 295, 303 (1976) ("It has long been established that the holder of an unexpired leasehold interest in land is entitled, under the Fifth Amendment, to just compensation for the value of that interest when it is taken upon condemnation by the United States." (footnote omitted)).

"[T]he federal and Vermont Constitutions use virtually the same test for takings review." *Ondovchik Family Ltd. P'ship v. Agency of Transp.*, 2010 VT 35, ¶ 14, 187 Vt. 556, 996 A.2d 1179 (quoting *Conway v. Sorrell*, 894 F. Supp. 794, 801 n.8 (D. Vt. 1995)). In order to state a claim under the Takings Clause, a plaintiff must sufficiently plead: (1) a protected property interest; (2) that has been taken under color of state law; (3) without just compensation. *See Econ. Opportunity Comm'n of Nassau Cty. v. Cty. of Nassau, Inc.*, 47 F. Supp. 2d 353, 368 (E.D.N.Y. 1999); *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 452 (S.D.N.Y. 1998). A plaintiff is no longer required to exhaust state procedures for obtaining just compensation before bringing her takings claims to federal court. *See Knick v.*

*Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2167, 2170 (2019) (overruling state-exhaustion requirement as "an unjustifiable burden on takings plaintiffs," and holding that "[t]he Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner"), *overruling Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985), *and abrogating Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 100 (2d Cir. 1992) (requiring Vermont takings plaintiffs to bring a suit in state court before asserting § 1983 takings claim). Here, the parties dispute only whether Plaintiffs have plausibly alleged that a "taking" occurred.

A property loss is compensable as a taking only when "the government intends to invade a protected property interest or the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." *Mays v. Tenn. Valley Auth.*, 699 F. Supp. 2d 991, 1026 (E.D. Tenn. 2010) (internal quotation marks omitted); *see Ondovchik Family Ltd. P'ship*, 2010 VT 35, ¶ 16. As such, "[o]n a takings theory, the government cannot be liable for failure to act, but only for affirmative acts by the government." *St. Bernard Parish Gov't v. United States*, 887 F.3d 1354, 1360 (Fed. Cir. 2018); *see id.* ("While the theory that the government failed to maintain or modify a government-constructed project may state a tort claim, it does not state a takings claim."); *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1341 (2018) ("[G]overnment inaction cannot be the basis for takings liability."); *Nicholson v. United States*, 77 Fed. Cl. 605, 621 (2007) ("[O]missions or claims that the Government should have done more to protect the public do not form the basis of a

valid takings claim."); *Funderburk v. S. Carolina Elec. & Gas Co.*, 2019 WL 3504232, at *5 (D.S.C. Aug. 1, 2019) (granting county's motion for summary judgment where plaintiffs alleged failure to address or repair drainage system, noting "[p]laintiffs do not cite to any case where a government actor incurred Fifth Amendment takings liability based on its inaction"); *Sunflower Spa LLC v. City of Appleton*, No. 14–C–861, 2015 WL 4276762, at *1 (E.D. Wis. July 14, 2015) (finding that "government inaction—e.g., deferred maintenance [of city's water mains]"— could not form the basis of takings claim); *Bos. Taxi Owners Ass'n, Inc. v. City of Boston*, 84 F. Supp. 3d 72, 80 (D. Mass. 2015) ("Plaintiffs fail to proffer any legal support for their contention that the City's inaction constitutes a taking. To the contrary, courts have found that the government must act affirmatively to warrant the application of the Takings Clause."); *Valles v. Pima Cty.*, 776 F. Supp. 2d 995, 1003 (D. Ariz. 2011) (same).

Plaintiffs do not cite to any federal court case where the government's inaction amounted to a Fifth Amendment taking. Instead, Plaintiffs rely on *Alger v. Dept' of Labor and Industry*, 2006 VT 115, ¶¶ 33–35, 181 Vt. 309, 917 A.2d 508, where the Vermont Supreme Court reversed the lower court's dismissal of the plaintiffs' takings claim, which was premised on the government's alleged failure to enforce Vermont's housing code. However, *Alger* is not persuasive for several reasons.

First, *Alger* involved a prospective class alleging the government's "general failure to enforce the housing code" across multiple apartments and buildings, *id.* ¶ 8, and specifically distinguished the situation present in this case, involving just

two tenants and a single building, *id.* ¶ 35 n.6. Responding to the dissent's criticism
that the decision would allow "[a]ll victims of loss arising from regulatory or
criminal violations by third parties [to] claim compensation upon a mere allegation
[of] . . . a lack of action by the enforcement authority," *id.* ¶ 58, the majority stated:
"Plaintiffs allege a complete failure of the [government] to act as statutorily
prescribed—affecting an entire class of persons—rather than a discretionary
decision resulting in dissatisfaction or loss to one renter," *id.* ¶ 35 n.6. Here, the
allegations in the Complaint concern only one particular building and two specific
renters; these facts are more akin to the latter scenario described by the majority in
*Alger*. Here, unlike in *Alger*, Plaintiffs have asserted no facts relating to a
wholesale failure of the City to enforce the housing codes.

Second, the *Alger* court acknowledged that its decision simply allowed the
plaintiffs' "unusual" takings claim to survive a motion to dismiss and declined to
opine on whether the plaintiffs would ultimately be successful on the claim's merits.
*Id.* ¶¶ 34, 35 n.6. In reaching its decision, the Vermont Supreme Court applied a
different standard than that applied to motions to dismiss in federal court:
"whether, taking all of the nonmoving party's factual allegations as true, it appears
beyond doubt that there exist no facts or circumstances that would entitle the
plaintiff to relief." *Id.* ¶ 12 (internal quotation marks omitted). This "no facts or
circumstances" standard is an "exceedingly low" notice-pleading standard. *Bock v.
Gold*, 2008 VT 81, ¶ 4, 184 Vt. 575, 959 A.2d 990 (internal quotation marks
omitted). The federal standard requires more: as noted earlier, to survive a motion
to dismiss in federal court, a complaint must present claims that are "plausible on

[their] face," *Twombly*, 550 U.S. at 570, and "raise a right to relief above the speculative level," *id.* at 555. *See Eng v. City of New York*, 715 F. App'x 49, 52 (2d Cir. 2017) ("[State-law] claims, brought in federal court, are subject to the federal pleading standard, and not the relaxed pleading standards of New York state courts."); *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015) (with regard to state-law claim, reciting *Twombly* and *Iqbal* standards and stating "[t]hese federal pleading rules and standards . . . prevail in all civil actions" (internal quotation marks omitted)).

Applying the "no set of facts standard," *Bock*, 2008 VT 81, ¶ 5 (internal quotation marks omitted), the *Alger* court permitted the plaintiffs' "unusual" takings claim to proceed based on its determination that their "complaint corresponds to general takings principles." 2006 VT 115, ¶ 34. But upon close examination of the "general takings principles" espoused by the federal courts, as explained above, as well as the Vermont Supreme Court in cases decided since *Alger*, this Court cannot conclude that Plaintiffs have stated a plausible takings claim stemming from the City's alleged failure to bring enforcement action against Plaintiffs' landlord. *See, e.g., Lorman v. City of Rutland*, 2018 VT 64, ¶ 35, 207 Vt. 598, 193 A.3d 1174 ("For a property loss to be compensable as a taking, the government must 'intend[ ] to invade a protected property interest or the asserted invasion [must be] the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action.'" (alterations in original) (quoting *Ondovchik Family Ltd. P'ship*, 2010 VT 35, ¶ 16)). Accordingly, Plaintiffs' takings claim cannot survive the Motion to Dismiss.

## Conclusion

For the foregoing reasons, the City's Motion to Dismiss (Doc. 18) is DENIED insofar as the Motion seeks dismissal of Plaintiffs' Fourteenth Amendment procedural due process claim and Fourth Amendment unlawful seizure claim; and GRANTED insofar as the Motion seeks dismissal of Plaintiffs' Fifth Amendment Takings Clause claim based on the City's alleged inaction.

Dated at Burlington, in the District of Vermont, this 21st day of February 2020.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge